IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

MARY CELESTE PARK,                          ) NO:  2:14-cv-1634
                                            )
                        Plaintiff,          )
                                            ) COMPLAINT FOR DAMAGES
v.                                          )
                                            )
OFFICER ELIZABETH LITALIEN, SARGEANT )
BRETT ROGERS, CITY OF SEATTLE,              )
a municipality, and JOHN DOE SEATTLE        )
POLICE OFFICES 1-5,                         )
                                            )
                        Defendants.         )

Plaintiff, MARY PARK, alleges:

## I.      JURISDICTION AND VENUE

1.1     This is an action for money damages brought pursuant to 42 USC §§1983, and the

Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, and

under the common law of the State of Washington and the Constitution of the State of

Washington Section 3; against the City of Seattle for actions taken by its police

officers.

COMPLAINT - Page 1 of  27

1.2    Jurisdiction is based upon 28 USC §§ 1331 and 1342 and this Court has pendant jurisdiction over the state law claims contained herein, which arise out of the same conduct as the federal claim and question under 18 USC §2520 and because pendent jurisdiction serves the interest of judicial economy, convenience and fairness.

## II.    PARTIES

2.1    Plaintiff, Mary Park, is a resident of King County, Washington.

2.2    Defendant, Elizabeth Litalien, is a resident of King County, Washington and an Officer of the Seattle Police Department at all times relevant hereto.   At all times relevant hereto, Officer Litalien was a duly appointed officer of the City of Seattle Police Department, acting under color of state law, to wit, under color of statutes, ordinances, regulations, policies, procedures, customs and usage of the City of Seattle.

2.3    Defendant, City of Seattle, is a municipal corporate entity under the laws of the State of Washington and the public employer of Officer Litalien.

2.4    Defendants Rogers and John Doe Officers 1-5 are employees of Defendants City of Seattle Police Department.   The action or inactions of the defendants John Does 1-5 were made with the knowledge, permission, and consent of their employer, and were made within the scope of their employment with defendant City of Seattle as police officers and at all times material were acting within the scope of their employment. Plaintiff is not aware of the true names of said John Doe Police Officers and their true names will be substituted when discovered. By information and belief, Sergeant Rogers was the supervisor of Defendant Litalien and was working with in the scope of his duties to supervise at all times pertinent hereto.

### III.    CLAIM FOR DAMAGES

3.1    Two claims for damages were properly filed with the Defendant City of Seattle pursuant to Washington law.  On August 15, 2014, Plaintiff filed a Claim with the City of Seattle for violation of Mary Park's constitutional and common law rights, false arrest, malicious prosecution, emotional infliction of emotional distress and deprivation of Park's constitutional rights.   On August 17, 2012, Plaintiff filed a separate claim with the City of Seattle for defamatory per se statements made to the press and others by Detective Elizabeth Litalien and others, without privilege, accusing Park of theft and abuse of Hermine Berner.

3.2    The City of Seattle and Detective Litalien have not responded to Park's Claims. Park did not file this lawsuit until the mandatory sixty day waiting period had elapsed.

### IV.    JURY DEMAND

4.1    Pursuant to Fed. R. Civ. P. 38, plaintiff hereby demands a trial by jury.

### V.    BACKGROUND FACTS

5.1    On or about February 25, 2012, Mary Park was hired by Judy Townsend ("Townsend") and Hermine Berner ("Berner") to begin working as a caregiver for Judy Townsend's elderly parents, Hermine and Emmanuel Berner (collectively, the "Berners"). Park was hired at $12 per hour.

5.2    At the time Park was hired as a caregiver for the Berners, she had an excellent reputation as a loving, trustworthy, gentle, dependable, hard-working, responsible and diligent caregiver.

COMPLAINT - Page 3 of  27

5.3 At the time Park was hired as a caregiver for the Berners, the Berners lived by themselves in a condominium in Seattle; Emanuel Berner was 97 years old and Hermine Berner was 91 years old. Emanuel Berner did little else than sleep all day, watch television and eat. Hermine Berner ("Berner") was active and alert, but had dementia.

5.4 Park explained to Townsend and Berner that caregiving was the only occupation that eased her emotional pain and suffering after caring for her own parents and seeing them suffer during long illnesses prior to their deaths.

5.5 Park assumed that Townsend was the legal guardian or attorney in fact for the Berners. Park was usually paid by Townsend in cash or by check, signed by Townsend and drawn from the Berners' checking account.

5.6 It was never Park's responsibility to dispense medications to the Berners, and she never did so. Emanuel Berner did not take medication and Hermine Berner's medications were dispensed to her automatically from a locked container at pre-set times and in predetermined dosages. Townsend was the only person with a key to the locked container and she was the only person who filled it with medication. Berner took her medications from the locked container in the mornings before Park arrived for work and in the evenings after Park left for the day.

5.7 When Park was first hired by Townsend and Berner she was to spend two hours per day with the Berners, during which time she was to cook their afternoon meal.

5.8    Park quickly grew fond of the Berners and they seemed to grow fond of her.  Park was eager and willing to render whatever care to the Berners they wanted and that she was authorized and qualified to render.

5.9    Not long after Park started caring for the Berners, it became obvious to her that they needed a caregiver to be with them more than two hours per day and to do more things to care for them than just cook them lunch.  It was not long before Park was spending more time caring for the Berners and she provided them with the following care: cooked them breakfast and lunch; cleaned all the rooms in their condo, including vacuuming, sweeping and mopping the floors; washed the dishes; cleaned all of the sinks, toilets and baths; did their laundry; took Berners for walks; took both the Berners to doctor appointments; and bought their groceries.

5.10   Park had to cook special meals for Emanuel Berner because he has no teeth. He is extremely frail and, for all practical purposes, an invalid.  He slept or watched television practically the entire time. The only clothes Emanuel wore were his pajamas, because he never left their condo.  The only time Emanuel ever left their condo or dressed in street clothes was the one time Park and Lewis Townsend took him to the doctor because of a rash on his chest.  He was so weak and frail that Park had to dress him on that one occasion when Park and Lewis Townsend had to take him out of the condo to go to the doctor.

5.11   Park sometimes held Hermine Berner's hand to help her out of the bathtub.  Park purchased and installed a hand hold on the wall for Berner to grab onto and lift herself out of the bathtub.

COMPLAINT - Page 5 of  27

5.12   Although it was obvious to Park that Berner had dementia, she was nonetheless active and starved for company.  She enjoyed going on walks with Park, although she did not like leaving Emanuel Berner alone for very long. Berner spent many hours talking with Park. It seemed to give Berner comfort to tell her troubles to Park.

5.13   In order to keep Berner active and alert and in order to help both the Berners as much as possible, Park asked Berner on a daily basis if there were any projects that needed doing that Park could do.  One of the projects that Berner asked Park to do was to replace the shelf paper in their kitchen and pantry.  Before Park started the shelf paper project, Townsend was informed that Berner had requested Park to do it; and Townsend did not object to Park doing it.

5.14   The first thing Park did to get started on the shelf paper project was to buy the shelf paper.  Berner was very frugal, and so decided that instead of using the shelf paper Park had purchased, she wanted to use left over Christmas wrapping paper she had on hand.

5.15   Because Park did other task for the Berners and could only spend about four hours each day with them, it took Park several days to finish replacing the old shelf paper with the Christmas wrapping.  Berner watched Park and kept her company the entire time she worked on the shelf paper.

5.16   On June 25, 2012, Park replaced the shelf paper in the upper kitchen cabinets.

5.17   On June 26, 2012, Park replaced the shelf paper in the pantry.

5.18   When Park removed the shelf paper from one of the bottom shelves in the pantry, she found $1,000 in cash in 10 $100 bills underneath it.   Park was surprised at this

COMPLAINT - Page 6 of  27

discovery and immediately turned around and handed the money to Berner, who was very near to her. As a reward, Berner gave Park $100 out of the $1,000.  Park then saw Berner put the $900 on one of the upper shelves of the pantry.

5.19   Berner asked Park not to say anything to Townsend about the money Park found under the shelf paper. Park was not surprised by this request.  There were frequent occasions when Berner and Park talked alone together.  Berner told Park that Townsend took out her anger on Berner. Park observed first hand that Townsend often spoke harshly to Berner and was mean and accusatory. Park saw and heard Townsend yell at Berner in a loud voice, "You are ruining my life."  Park saw that Townsend's tirades made Berner cry. It was obvious to Park that Berner was intimidated by Townsend.  Park strongly considered calling Adult Protective Services (APS) to report what she thought was abusive treatment of Berner by Townsend, but Park did not do so.  Park was afraid that if she reported Townsend to APS Townsend would retaliate against her. However, when Park related to Park's psychotherapist, Suzan R. Wilson, MA, MFCC, how she witnessed Townsend treat Berner, Wilson called APS anonymously for Park.

5.20   On June 27, 2012, the day after Park observed Berner hide the $900, which Park had found under the shelf paper, Berner telephoned Park and asked "Where is the money?" Park reminded Berner that she placed the $900 on one of the upper shelves in the pantry and that she must have moved it again and forgotten where she had put it. However, Berner continued to insist that she could not find the money.  She just kept asking Park "Where is the money?"

COMPLAINT - Page 7 of  27

5.21   Although Berner had asked Park not to tell Townsend that she had found money under the shelf paper, Park telephoned Townsend that same day because, based on her conversation with Berner, Park was concerned that Berner suspected her of stealing the $900.

5.22   On June 27, 2012, Park told Townsend that she had found $900 in cash when she replaced the shelf paper in the pantry, that she gave the $900 back to Berner, that Berner re-hid the $900 and now cannot find it and seemed to think that Park stole it. Park explained to Townsend that it was a bad situation whenever an elderly person suspected their caregiver of stealing. Park told Townsend that she thought she should resign her position. Townsend pleaded with Park not to quit.  Townsend told Park that Berner had dementia.  Townsend said Berner was constantly hiding money around her condo then would forget where she put it.  Townsend told Park that she knew Park did not steal anything.  Based on these assurances from Townsend, Park decided not to quit.

5.23   During this same call from Park to Townsend on June 27, 2012, Park did not tell Townsend that she had found $1,000.00.  Instead, Park told Townsend that she only found $900.00.  Park also did not tell Townsend that Berner had given her a $100.00 reward.  Park was afraid that if she told Townsend that Berner had given her a $100 reward for finding the money in the pantry that Townsend would abuse Berner again or would retaliate against Park if Park told her that Berner had given her a $100 reward.

5.24   Park returned to the Berners' condo the next day, June 28, 2012.  Park and Berner looked for the $900 that Park had seen Berner re-hide on an upper pantry shelf the day before, but Park and Berner could not find $900.

5.25   After June 27, 2012 and during the remainder of the time that Park continued to work as a caregiver for the Berners, Berner accused Park of stealing the $900 several more times.   Although her accusations bothered Park, Park did not quit over these accusations because she attributed them to Berner's dementia.   Park knew that suspicion and paranoia are very common with dementia patients.

5.26   Townsend learned that Berner had accused Park of stealing the $900 again.  In a mean, threatening tone of voice, Townsend ordered Berner to stop it.  Townsend told Berner that if she did not stop accusing Park of stealing the $900, Park might quit.

5.27   Park continued to work as a caregiver for the Berners, despite Berner's continued accusations, because she attributed the accusations to Berner's dementia, plus Park was genuinely fond of the Berners, she knew they needed her care and she felt sorry for Berner because of the way Townsend mistreated her.

5.28   Townsend complained about how much Park was being paid, even though Park only charged $12.00 per hour, was working only about four hours per day and the Berners clearly needed a minimum of four hours of care per day.

5.29   On July 29, 2012, Townsend cut Park's hours back to only two hours per day, the number of hours she was originally hired to work.   Park was disappointed and objected to the reduced hours because she knew and expressed to Townsend that the Berners needed to have a caregiver more than two hours a day.  Although she was not

COMPLAINT - Page 9 of  27

happy with the decision, Park informed Townsend that she would agree to the cutback in her hours. Park agreed to the reduced hours because she genuinely wanted to continue to care for the Berners, even if it meant only being there two hours a day. Park felt that it was better that she work only two hours per day than have Townsend hire a different caregiver for the same two hours per day who might not care as much for the Berners as Park did.  Despite Park's willingness to accept the reduced hours, Townsend terminated her on July 29, 2012.

5.30    Throughout her employment as a caregiver for the Berners, Park performed her duties with the utmost skill, care and honesty.  Park had never stolen anything from the Berners and had never abused the Berners in any way.

**TOWNSEND'S CHARGES OF THEFT AGAINST PARK AND THE INVESTIGATION OF THOSE CHARGES BY DETECTIVE LITALIEN.**

5.31    According to Defendant Detective Elizabeth Litalien of the Seattle Police Department, on August 8, 2012, she met with Sargent G. Pratt at the Southwest Precinct of Seattle Police Department who informed her that Judy Townsend had reported to Lieutenant Pierre Davis of the Southwest Precinct that her mother, Hermine Berner, had been the victim of theft by her caregiver, Mary Park.

5.32    On August 8, 2012 Detective Litalien spoke with Townsend. Townsend informed Litalien that she was an active member of the Seattle Police Department's Southwest Precinct Advisory Committee.

COMPLAINT - Page 10 of  27

5.33   Litalien's entire investigation was tainted by Townsend's special relationship with the SPD.  Due to this special relationship, Townsend received special consideration by the SPD.

5.34   Townsend's special relationship and preferential treatment by the SPD was not disclosed to Park.

5.35   Litalien claims to have had an extensive telephone conversation with Townsend on August 8, 2012, at which time Townsend reported that $50,000 was stolen from a baking dish from the Berner's pantry. Townsend also claimed that some jewelry was stolen and Mary was withholding medication from Hermine in order to confuse Hermine.

5.36    On August 13, 2012, Detective Litalien interviewed Hermine Berner on audio and videotape at her home.

5.37   On August 14, 2012, Litalien collected evidence at the home of Judy and Lew Townsend, which consisted of timesheets submitted to Townsend by Park for her time spent as a caregiver for the Berners.

5.38   On August 15, 2012, Detective Litalien and several other officers arrived at Mary Park's house with a search warrant.  Litalien did not obtain any review of the search warrant with the Prosecutor before obtaining a search warrant. After interviewing plaintiff and the search of her premises, Detective Litalien arrested Park.  Plaintiff was not read her Miranda rights.  Plaintiff was arrested without an Arrest Warrant and without probable cause.

5.39    No one from SPD took clear photographs of the Berner's pantry or the baking dishes, there were no eye witnesses to the alleged theft.  No one from SPD took latent fingerprints of the baking dishes or the plastic bags in which the baking dishes were allegedly stored.  No other testing or forensics were done at the home of the Berners' prior to Park's arrest.  Nothing indicated Litalien had taken steps to investigate the scene of the alleged crime in a manner consistent with regular SPD policies and police procedures.

5.40    Litalien took possession of all or at least some of the evidence collected in the warrant of Park's house. Not all the evidence was given to the Evidence Unit of the SPD.

5.41    A lawsuit was filed by Mary Park against Hermine and Emmanuel Berner and Judy and Lewis Townsend for defamation per se. Detective Litalien's deposition was taken pursuant to this lawsuit filed against the Townsends and Berners on January 21, 2014. In her deposition Detective Litalien stated that she believed Judy's story and she disbelieved Mary's story. Judy, the Berner's daughter, had all powers of attorney and access to bank accounts, safety deposit boxes and all other of her parents' financial matters.  All records indicate Litalien did not take all steps necessary investigate the scene of the alleged crime in a manner consistent with regular SPD police policies and procedures.

5.42    It is presumed that Litalien knew that 90% of all crimes against Elders, including physical abuse and financial exploitation, are generally committed by family and powers of attorney, not caregivers.

5.43   The week prior to the alleged $50,000 theft (and Mary's termination on July 29, 2012), Judy's brother, Harold Berner, visited his parents. Harold spent the night at the condo. Litalien did not interview Harold after his stay at his parent's condo despite being informed of that event.

5.44   When Litalien applied for the search warrant by signing a certification for probable cause, she did not disclose that Berner had given a video and audio tape interview that was contrary to the Litalien's report. Litalien did not inform the court of either the investigation report or Berner's videotape interview. All Litalien gave the Magistrate was a certification for probable cause which didn't even mention that she had already interviewed Berner. The same is true when Litalien signed the certification for probable cause in support of the criminal complaint. Litalien did not disclose that she had obtained a videotape of Berner. Litalien did not disclose that the videotape interview was inconsistent. The deputy prosecutor "rush-filed" the criminal complaint. Litalien did not reveal to the prosecutor that she had obtained the invoices for Park's work from Townsend on August 14, 2012, which contradicted the facts in the Certification for Probable Cause that Litalien had signed for the Search Warrant and that was attached to the Criminal Information.

5.45   Park was so emotionally distraught over her arrest and imprisonment that when in jail, she attempted suicide with a spork, and was placed on suicide watch.

5.46   Litalien reported and gave interviews about the criminal allegations against Park and of her arrest to the press. Stories appeared nationally and in the local press including CNN, UPI, and Q 13, KOMO, the Seattle Times and other media.

5.47  Defendants, including Litalien, committed defamation per se because Park committed no criminal conduct or any acts of moral turpitude.

5.48  The deposition of Det. Litalien was taken as part of the discovery of the lawsuit against Berner and Townsend on January 21, 2014.

5.49  When the evidence collected at Mary Park's home was returned to her, after the criminal case was dismissed, notes Park had taken about Townsend's mistreatment and abuse of Berner, which had been taken by Litalien during the search by the SPD, was not returned to her.

5.50  On August 13, 2012, Hermine Berner gave an interview to Litalien and Detective Donna Stangland at Hermine's condo. She said in the audio and videotaped interview that she did not know how much money there was and had no evidence of the existence of $50,000 cash or the theft of $50,000.

5.51  Berner gave other statements to Litalien during her interview that are inconsistent with statements that Litalien had attributed to Hermine Berner in Litalien's Certifications for Probable Cause to obtain a search warrant and that were attached to the criminal complaint.

5.52  Litalien later concealed the existence of Hermine's videotape and audiotape interviews from her Certification for Probable Cause that was presented to the Magistrate, when she obtained the search warrant.  Further, Litalien concealed the existence and the inconsistencies in the videotaped interview of Hermine from the Certification for Probable Cause that was attached to the Criminal Complaint.

**EXECUTION OF SEARCH WARRANT OF MARY PARK'S RESIDENCE**

5.53   On August 13, 2012, Hermine Berner gave an interview to Litalien and Detective Donna Stangland at Hermine's condo. She said in the audio and videotaped interview that she did not know how much money there was and had no evidence of the existence of $50,000 cash or the theft of $50,000.

5.54   Hermine gave other statements to Litalien during her interview that inconsistent with statements that Litalien had attributed to Hermine Berner in Litalien's Certifications for Probable Cause to obtain a search warrant and that were attached to the criminal complaint.

5.55   Officer Litalien requested a search warrant of Mary Park's residence from the Magistrate on August 15, 2012.  In her request to the Magistrate for the search warrant of Park's residence, Litalien signed what she called a Certification for Probable Cause, when in fact no probable cause for a search warrant existed.

5.56   The Prosecutor did not sign the Certification for Probable Cause.

5.57   Litalien did not obtain a signature or approval of any Prosecutor for what she called the Certification of Probable Cause.

5.58   Litalien arrived at Mary Park's house on the morning of August 15, 2012 with a search warrant obtained by falsifying, misleading and withholding evidence with the Magistrate.

5.59   Officers present to search the Park home were Sgt. Brett Rogers, supervisor for the search warrant, Detective St. John and Detective A. Thorpe.

5.60    Litalien did not obtain Park's permission to record her statement.  Park was pressured into answering questions by Litalien while other officers searched Park's home and premises.

5.61    Litalien did not read Park her Miranda Rights.

5.62    None of the statements Park made to the officers who conducted the search constituted probable cause to arrest her.

5.63    One of the reasons that Litalien gave as probable cause to arrest Park was that she thought Park lied about Townsend abusing Berner.

5.64    Litalien took possession of objects and papers in the search warrant, including Park's notes, which outlined Townsend's abusive treatment of Berner.

5.65    These notes were not returned to Park and her legal Counsel, Mark J. Wilson, when they picked up Park's possessions in an evidence bag.

5.66    Park made statements and was coerced by Litalien without telling Park she was being taped and without reading Park her Miranda rights.

5.67    Litalien never asked Park in the taped interview if Park had even taken notes about Townsend's abuse of Berner.

5.68    Litalien and the City of Seattle and its entity, the Seattle Police Department searched Park's premises and arrested her without probable cause.

5.69    Park was prosecuted without probable cause, in violation of her constitutional rights.

5.70    Litalien and the City of Seattle and its entity, the SPD, destroyed evidence.

COMPLAINT - Page 16 of  27

5.71   Litalien obtained Park's notes regarding Judy's abuse of her mother, Hermine, which were not returned.  The existence of the notes was not disclosed to the Prosecutor by Litalien.

5.72   Litalien took custody of the evidence in the search of Park's residence, instead taking it to the Evidence Unit of the SPD.

5.73   Later, Park and her Counsel retrieved what was represented to them to be all of the evidence that had been confiscated pursuant to the search warrant.

5.74   Park inspected the evidence and noticed that the notes she made about Judy's abuse of Hermine were missing.

5.75   Park's notes were confiscated by Litalien and/or the SPD.

5.76   The notes were not produced by the Prosecutor to Park's defense counsel in discovery.

5.77   The notes exonerated Park, because clearly, the notes indicated that Park was concerned for Hermine's welfare against Judy, and was making notes of Judy's mistreatment of Hermine.

5.78   Other evidence from Park's house showed she had her own investments and money and did not need money from Hermine.

5.79   Litalien was not trained in proper investigation of vulnerable adults.

5.80   Litalien the other officers involved in this case were not properly trained by the City of Seattle or the SPD in proper policies and procedures for investigating criminal complaints of financial exploitation and physical abuse of vulnerable adults.

5.81   Had proper investigation been done by SPD law enforcement personnel according to proper policies and procedures or investigating criminal complaints of vulnerable

adults, they would have known there was insufficient evidence to charge Park to file any criminal complaint against her.

5.82   No investigation was made of Judy, her brother Harold Berner, who visited his parents at their condo, Judy's adult daughter, Rachel or Judy's husband, Lewis Townsend. It would have been known that the most frequent suspects, 90%, are children or other family members and those with powers of attorney of a vulnerable adult.

5.83   There were no detailed or clear photos taken of the Berner's pantry, the baking dish, and how it was maintained.

5.84   There were no drawings or descriptions of the jewelry, which was supposedly stolen, in order that Litalien could identify this jewelry if it was found at Park's house, when she conducted the search of Park's house and Hermine's safe deposit box.

5.85   There were no fingerprints taken in the pantry and of the baking dish and plastic bag around the baking dish prior to the criminal complaint being filed.

5.86   There was no prosecutor review prior to the complaint being filed.

5.87   Litalien, nor any of the other investigators in this case were properly trained in the investigation procedures of financial exploitation and abuse of vulnerable adults.

5.88   No policies are in place by the City of Seattle and its entity the SPD to insure that the rights of individuals who are accused of elder abuse are protected.

5.89   In this case the individual SPD Officers determined their own procedures for investigating Elder Claims.

5.90    Litalien acted as the decider of fact when she spoke with Judy in the phone conversation that took place on August 8, 2012, saying she believed Judy's story over Park's.

5.91    Litalien chose, on her own, to omit pertinent evidence, such as the audio and video taping of Hermine, when seeking a search warrant from the Magistrate.

5.92    Litalien chose not to disclose these recordings to the Prosecutor in determining probable cause.

5.93    Litalien improperly interrogated Park without obtaining Park's permission for a recording to be made.

5.94    Litalien did not read Park's Miranda rights.

5.95    Litalien kept evidence, rather than giving it to the Evidence Unit, where no possibility of tampering or destruction of evidence could take place.

5.96    The City of Seattle and the SPD have no guidelines regarding the proper procedures and documentation in elder abuse cases.

5.97    In essence, Litalien was not properly trained or supervised by the City of Seattle and the SPD in conducting her investigation.

5.98    Litalien's Unpublished false statements to the press and others about Park

5.99    One incident of Litalien's false statements to the press was an article carried by UPI on August 23, 2012.  These statements constitute defamation per se.

5.100   Investigators also say Mary Park, who is to be arraigned next week on theft charges, also may have withheld cardiac medication from her charge, the Seattle Post-Intelligencer reported

COMPLAINT - Page 19 of  27

5.101   Litalien knew these statements were false. Litalien knew that Park had no access to the medication box, which required a key only Judy or others were responsible for monitoring and administering the medication.  Litalien knew that the medications were dispensed automatically from the medication box prior to Park coming into work and after she left.

5.102   Litalien's actions led to Park's arrest and, due to the dramatic nature of the accusations that Park stole money from elderly Holocaust survivors, the story, as it was stated, was carried in the press, including local and national television, radio and worldwide printed media.

5.103   Due to Litalien's favoritism of Judy, as a member of the Alki Police Advisory Committee, she did not question Judy's accusations.  In fact, she turned a blind eye that was staring her in the face of Park's innocence.

5.104   Judy's time sheets were presented to Litalien on August 14, 2012, that showed that the shelf paper project was done three weeks earlier than Judy's time sheets reported. Park's time sheets reported the shelf paper project was done on June 25, 26 and 28, 2012.

5.105   Litalien did not even give consideration to the fact that Judy did not even report the theft until Park had been terminated on July 29, 2012, which was over a month after the shelf paper project had been completed.

5.106   Litalien failed to give any consideration that Judy had a motive to falsely accuse Park of stealing of $50,000.  She could make an insurance claim, which she made to the

Berner's home owner's insurance.  She made statements to the press and prompted people to make donations to Hermine out of sympathy.

5.107   Judy was able to persuade Litalien to maliciously prosecute Park for theft, when there was no evidence of theft.

5.108   Litalien permitted herself to be used by Judy.  She was persuaded by Judy, Hermine's power of attorney, that $50,000 existed to begin with.  Judy allegedly permitted Hermine to keep $50,000 in cash for a period of 10 years in a baking dish in the pantry, without questioning her mother's judgment.  Litalien did not question Judy's judgment.

## **Arrest and incarceration**

5.109   Park was arrested without an Arrest Warrant.  According to Litalien's own statements in her deposition dated January 21, 2014, she did not obtain an arrest warrant.

5.110   Litalien did not obtain an arrest warrant from the Prosecutor.

5.111   The audio tape taken by Litalien of Park during the search of Park's house shows that she was intimidated during the search of the premises.

5.112   Park was told she would be ruined by this case.

5.113   Park was told she was guilty.

5.114   Park, a resident of Alki and her street for 54 years, was frisked in front of her home with her neighbors watching.

5.115   Park was handcuffed and placed in the back of a police car and driven in front of her neighbors and through her neighborhood to the King County Jail.

5.116   In jail, Park was fingerprinted and mug shots were taken.

5.117   Park was forced to remove her clothing and to wear an orange King County Jail jumpsuit.

5.118   All personal possessions were taken from her.

5.119   During her incarceration, Park felt her life was destroyed and was suicidal.   She attempted suicide with the only sharp object at her disposal, which was a "spork," a spoon and fork combination.  She tried to slit her wrists and did cut her skin.

5.120   Park was placed on suicide watch.

5.121   Park suffered incredible humiliation for a crime she was ultimately cleared of committing.

## Economic losses

5.122   Park had to attain legal counsel and incurred attorney fees of $15,000

5.123   She incurred the cost of defending the criminal charges, which were later dismissed.

5.124   Park suffered loss of income from the Berners as well as other elderly people for whom she was working at the time of her arrest and subsequently, due to loss of her reputation as a caregiver

5.125   Park suffered loss of her reputation and subsequent income due to the press accounts of her arrest and incarceration.

5.126   Park suffered defamation per se because it included allegations of criminal conduct and moral turpitude.

5.127   Emotional Distress

5.128  After the arrest and incarceration, Park required psychotherapeutic counseling, suffered emotional distress, suffered post-traumatic stress syndrome, humiliation, loss of reputation, loss of income, in amounts to be determined at the time of trial.

5.129  Park was unable to sleep or eat regularly and lost weight.

5.130  Park was obviously frightened about Judy hurting her, her boyfriend, her dog and her property.

5.131  Park reported that Judy followed her one day onto a dead end street, when Park was walking her dog and Park reported that Judy was screaming at her.  Park was shaken with fear and felt she should not go out onto side streets again.  Her movements were restricted by her well-founded fears.

5.132  These damages are illustrative and without limitation on presentation of complete damages at trial.

## VI.    FIRST CAUSE OF ACTION:
### 42 USC §1983 Against Individual Defendants

6.1  Sections 1 through 5 are incorporated herein.

6.2  Plaintiff claims damages for the injuries set forth above under 42 USC §1983 against individual defendants for abuse of process, malicious prosecution, false arrest, false imprisonment, and outrageous conduct in violation of plaintiff's constitutional rights under the Fourth, Fifth and Fourteenth Amendments to the U.S. Constitution, and under color of state law.

## VII.    SECOND CAUSE OF ACTION:
### Abuse of Process

7.1  Sections 1 through 6 are incorporated herein.

COMPLAINT - Page 23 of  27

7.2     Officer Litalien had a search warrant issued under a declaration for investigation of alleged theft.  The search warrant was executed at the plaintiff's home.

7.3     The defendant officers' conduct, as described above, constitutes an abuse of process in violation of the plaintiff's rights under Fourth, Fifth, and Fourteenth Amendment.

## VIII.    THIRD CAUSE OF ACTION:
### Defamation

8.1     Sections 1 through 7 are incorporated herein.

8.2     Defendant Litalien committed defamation against plaintiff by maliciously and without privilege publishing and/or conspiring to publish false and defamatory statements about the plaintiff.

8.3     The statements concerned the allegations made supporting the arrest and detention of the plaintiff by Litalien and, by information and belief, Litalien published these statements to the press and to other individuals without privilege to do so.

8.4     The above reference conduct resulted in damage to plaintiff, including but not limited to loss of reputation, humiliation, emotional distress, in an amount to be proven at trial.

## IX.    FOURTH CAUSE OF ACTION:
### Malicious Prosecution

9.1     Sections 1 through 8 are incorporated herein.

9.2     Defendant Litalien lacked any probable cause to arrest plaintiff.

9.3     Defendants' conduct also demonstrated malicious disregard for the plaintiff's rights in trying plaintiff's reputation in the press.

9.4     All charges against plaintiff were ultimately dismissed.

9.5     Plaintiff was damaged in an amount to be proven at trial, including but not limited to the costs of defending herself, the emotional and physical trauma of arrest and detention, and the injury to her reputation.

## X.     FIFTH CAUSE OF ACTION:
### False Arrest

10.1    Sections 1 through 9 are incorporated herein.

10.2    Defendants' actions constitute false arrest.

10.3    Plaintiff was subjected to arrest without probable cause.  Plaintiff now has a criminal arrest record and has to disclose the arrest on every application for employment.

10.4    Plaintiff was damaged by the false arrest in an amount to be determined at trial.

## XI.     SIXTH CAUSE OF ACTION:
### False Imprisonment

11.1    Sections 1 through 10 are incorporated herein.

11.2    Defendants' actions constitute false imprisonment.

## XII.     SEVENTH CAUSE OF ACTION:
### Outrage/Intentional Infliction of Emotional Distress

12.1    Sections 1 through 11 are incorporated herein.

12.2    Defendants' actions constituted intentional infliction of emotional distress.

12.3    As a result of the defendants tortious conduct, plaintiff suffered injury and severe emotional distress.

## XIII.    EIGHTH CAUSE OF ACTION:
### 42 USC §1983 Against City of Seattle

13.1    Sections 1 through 12 are incorporated herein.

COMPLAINT - Page 25 of  27

13.2    The City of Seattle Police Department developed and maintained policies and customs relating to the training and implementation of investigations that demonstrate a deliberate indifference to the constitutional rights of persons in Seattle, which caused the violation of plaintiff's rights.

13.3    The policy of the Seattle Police Department failed to adequately train its officers in investigating claims of elder abuse and gives the individual police officers unreasonable discretion in the decision to investigate, arrest, and refer cases for charges based upon inadequate evidence.   This broad delegation of authority to officers grants the officers uncircumscribed power to the officers that results in deprivation of citizen right to be free from unlawful search, seizure, detention without probable cause.

13.4    As a result of this policy and training the Defendant officers violated plaintiff's fundamental rights.

13.5    Plaintiff was damaged as a result of these violations in an amount to be determined in trial.

## XIV.   PRAYER FOR RELIEF

Plaintiff request that the Court enter judgment against Defendants as follows:

1.      Awarding compensatory damages to plaintiff against the defendants joint and severally;

2.      Awarding costs of this action to the plaintiff;

3.      Awarding reasonable attorney's fees and costs to the plaintiff for the First, Second, Fourth, and Fifth Causes of Action;

COMPLAINT - Page 26 of  27

4.      Awarding Plaintiffs prejudgment interest on any liquidated damage award and economic loss; and

5.      Awarding Plaintiffs any additional or further relief which the court finds equitable, appropriate and just.

DATED this 21st day of October, 2014.

*/s/ Anthony Gipe*
Anthony David Gipe, WSBA No. 30491
**Filing For:**
Mark J. Wilson, WSBA No. 16675

MARK J. WILSON, Attorney
500 Union Street, Suite 502
Seattle WA  98101-2332
Telephone: (206) 567-9826
Fax: (206) 567-9827
mjwilson@mjwilsonlawyer.com
Attorney for Plaintiff

COMPLAINT - Page 27 of  27